Daniel J. Kaiser [DK-9387]
William H. Kaiser [WK-7106]
KAISER SAURBORN & MAIR, P.C.
30 Broad Street, 37th Fl.
New York, New York 10004
(212) 338-9100

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
DAVID ADAM PALEY,

|  |  |
|---|---|
| Plaintiff, | **JURY TRIAL DEMANDED** |
| -against- | **COMPLAINT** |
| KLS PROFESSIONAL ADVISORS GROUP, LLC
and BOSTON PRIVATE WEALTH LLC, | Civil Action No. |
| Defendants. |  |

------------------------------------------------------------X

Plaintiff, David Adam Paley, by his attorneys, Kaiser Saurborn & Mair, P.C., as and for

his complaint against the defendants, alleges as follows:

**PARTIES AND VENUE**

1.      Plaintiff, David Adam Paley ("Paley"), was formerly employed by defendant in

the position of Managing Director and Chief Investment Officer.

2.      Defendant, KLS Professional Advisors Group, LLC ("KLS" or "defendant"), is

headquartered 1325 Avenue of the Americas, 14th Floor, New York, New York 10019.  Founded

in 1989 and headquartered in New York City, KLS is a wealth management firm specializing in

the complex financial needs of law firms, attorneys and other high net-worth segments.

3.      Defendant, Boston Private Wealth, LLC ("BPW" or "defendant"), maintains an

office at 1325 Avenue of the Americas, 14th Floor, New York, New York 10019.  On or about

1

September 23, 2019, Boston Private Bank & Trust Company (hereinafter, "Boston Private

Bank") had formally integrated KLS with BPW, a wholly-owned subsidiary of Boston Private

Bank.  The combined firm became one of the largest Registered Investment Advisors in the

United States as measured by client assets.

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because

the claims asserted herein arise under Title VIII of Sarbanes-Oxley Act of 2012 (18 U.S.C. 1514

A).  This court also has pendant jurisdiction over Mr. Paley's discrimination claims, pursuant to

NYS Executive Law 296, et seq. and NYC Administrative Code 8-107, 8-506.

5.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because it is a

District where plaintiff was employed by defendants and where the facts underlying his causes of

action occurred.

## BACKGROUND FACTS

## I.

## MR. PALEY'S EMPLOYMENT

6.      During his employment by KLS, Mr. Paley was employed in the Company's

New York City offices.

7.      In February 2016, Ms. Paley joined KLS as a Managing Director.

8.      During his employment with KLS, Mr. Paley was employed in the Company's

New York City offices.

9.      As a KLS Managing Director, Lead Relationship Manager, KLS' Deputy Chief

Investment Officer, and one (1) of the five (5) Voting Members of KLS's Investment

Committee, respectively, Mr. Paley reported to Gary Sica, a KLS Senior Managing Director,

who in turn reported to William Woodson, Executive Vice- President, Head of Wealth Advisory

and Family Office Services for Boston Private Wealth.

10.     Mr. Paley's job responsibilities included:

- Serving as a Lead Relationship Manager for high net-worth clientele;
- Providing advisory services to clients across all aspects of wealth management, *i.e.*, financial planning, tax, trusts & estates, insurance, and investments;
- Drafting the quarterly market review reports that were distributed to the Company's clients and internal advisors, respectively, which served to communicate the Company's investment perspective;
- Conducting portfolio analyses;
- Conducting fund manager due diligence;
- Organizing/leading topic discussions for Investment Committee meetings, wherein he would provide new investment ideas and portfolio changes to the Investment Committee;
- Supervising the trading implementation of portfolio changes;
- Implementing technology systems to better message the investment portfolio;
- Conducting education sessions on a monthly basis for Company employees; and
- Conducting bi-weekly investment portfolio/market reviews.

11.     Mr. Paley received uniformly positive feedback regarding his work product and was never the subject of a poor performance review or any discipline and/or or performance warnings.

12.     Mr. Sica and Mr. Woodson were responsible for maintaining a work environment free of illegal retaliation and illegal discrimination.

## II.

## MR. PALEY'S OBJECTION TO ILLEGAL FRONTRUNNING

13.     On Friday March 27th the Investment Committee, comprised of Gary Sica, Chief Investment Officer, Arthur Langhaus ("Langhaus"), a Senior Managing Director and Founder of KLS, Richard Perez ("Perez"), Alan Brod, Senior Managing Director, and Mr. Paley, voted to sell the exchange traded fund "IWD" in all client portfolio accounts (with the exception of those

with certain trading restrictions) and use the proceeds to purchase the exchange traded fund "IWF".

14.     As a fiduciary, KLS would execute the transaction across all client accounts simultaneously via "block transactions."

15.     Each block transaction was expected to be approximately $300mm in notional value.  Each trade was greater than the recent historical average trading volume for the security for an entire day.

16.     An investment committee memo memorialized the decision.

17.     Sica determined that the timing of the block transaction would be set by himself and Paley, the Deputy Chief Investment Officer.

18.     Due to market conditions, the large size of the transactions and operational issues associated with executing on behalf of a few hundred accounts, they determined that the transactions would occur on April 9, 2020.

19.     Paley, Sica and Tara Carley ("Carley") were on the phone with Fidelity's Trading Desk on April 9 when the block transactions were executed.

20.      Due to the size of the block transactions and market conditions, the transactions were executed at relatively wide bid/offer spreads (ie. clients received less proceeds for the sale and paid a higher price for the purchase relative to a smaller sized transaction).

21.     On April 1 or 2, an Associate sent Paley an email asking Paley to sign off on a trade ticket initiated by Langhaus in which a client was selling holdings of IWD and purchasing IWF.

22.     Paley refused to do so because it appeared to him that Langhaus was illegally "front running" the Investment Committee transaction.

23.     Paley emailed Langhaus, inquiring why he was executing this transaction and whether it was client directed or advisor directed (ie. directed by Langhaus).

24.     Langhaus responded that it was client directed.

25.     Paley did not believe Langhaus because it was highly coincidental that a client would direct Langhaus to purchase a security, IWF, that had never been purchased by the firm before, and was the very subject of the Investment Committee transaction.

26.     Paley himself was the person who first proposed the security selection to the Investment Committee after substantial analysis - so it is highly unlikely that any client conversations regarding IWF occurred prior to Paley's Committee recommendation.

27.     Paley spoke with Sica later that day and informed him that he believed Langhaus was illegally "front running" the Committee trade and that Sica should immediately inform the Head of Boston Private Compliance, General Counsel and Woodson.

28.     Paley stated to Sica that he believed the Firm had violated its fiduciary responsibility to treat all clients equally.

29.     Sica acknowledged to Paley that he had seen approximately "a dozen" similar transactions (selling IWD and buying IWF) by Langhaus and believed that these trades were "too coincidental" to be client directed.

30.     The above conduct violated US Securities Law and related rules and regulations.

31.     Sica also stated that he had received an email containing a spreadsheet, compiled by the operations team, that listed all of the suspect trades and was upset and concerned that this was sent to him by email.

32.     Plaintiff reasonably and in good faith believed that defendant's front running practices violated U.S. Securities Law and related rules and regulations.

33.     On April 13, 2020, plaintiff was terminated, at least in part, in retaliation for his complaints and objections to defendant's improper front running.

### III.

### THE ILLEGAL DISABILITY DISCRIMINATION

34.     On January 9, 2020, Mr. Paley apprised Sica that he was in discussions regarding the role of Chief Investment Officer at a soon-to-be-launched Registered Investment Advisor ("RIA").

35.     On January 13, 2020, Paley and Sica met in the office, during which they in large part discussed:

- The potential new role at the soon-to-be-launched Registered Investment Advisor;
- Mr. Paley's concerns about KLS;
- Mr. Paley's desire for the implementation of a revenue-based compensation structure going forward at KLS;
- Mr. Paley's queries as to whether KLS would have its own Investment Committee meetings independent of Boston Private Wealth;
- Mr. Paley's queries concerning the prospective demarcation of roles; and
- Mr. Paley's concerns emanating from the uncertainty going forward as a result of KLS' recent integration with Boston Private Wealth.

36.     Mr. Sica stated he would look into these areas of concern and get back to Mr. Paley.  He advised Mr. Paley not to discuss his exploration of alternative employment until after Paley received his 2019 bonus.

37.     On April 9, 2020 Paley advised Sica that he was suffering from an acute illness with which he had been initially afflicted in 2008 while at Deutsche Bank which had caused him to take three (3) months of disability in 2009.

38.     Symptoms of the illness include severe vertigo, labyrinthitis, migraines and

anxiety attacks. These symptoms substantially interfered with his major life activities.

39.     Mr. Paley has been treated throughout the years for this illness Acute Vertigo and Labyrinthitis by a combination of i) doctor visits with neurologists, Internists, ENTs, psychiatrists, psycho-pharmacologists, internists, and ii) medication.

40.     On April 3, 2020, Woodson advised Mr. Paley that the Company could not match an offer of a guarantee of $750,000.00 *per year* for two (2) years; however, because the Company "wants to entice [him] to stay" he could offer Paley a $650,000.00 guarantee for one (1) year.

41.      Woodson further advised that he intended to propose to Anthony Joseph ("DeChellis"), the Chief Executive Officer and President of Boston Private Bank, that the bonus pool for KLS should emanate from a percentage of revenues generated by KLS and, *if* such came to fruition, he offered to guarantee Mr. Paley the *higher* of (i) his $650,000.00 guarantee for one (1) year; *or* (ii) compensation correlative, formulaically, to the newly-proposed bonus pool.

42.     On April 5, 2020, Mr. Paley made a counter proposal of (i) a $700,000.00 guarantee for one (1) year, and ii) that he would be subject to the newly- proposed bonus pool for the second year.

43.     On April 7, 2020, during a telephone conference among Paley, Sica and Woodson – Woodson inexplicably stated that the Company had decided to accept Mr. Paley's resignation.

44.     Mr. Paley responded incredulously that he had not resigned and, in fact, he further noted that in every prior discussion he had stated explicitly that it was his intention to *remain* at KLS.

45.     Woodson ignored this and stated that Mr. Paley had allegedly given the Company and ultimatum, which was wholly without basis.

46.     Thereafter, Mr. Paley memorialized in a text message to Sica that he had not resigned nor had he given the Company an "ultimatum."

47.     When Paley spoke to Sica about this, Sica told him to let Woodson "cool off" and then they would again discuss Mr. Paley's compensation.

48.     On April 8, 2020, Mr. Paley worked from home and drove back for doctor appointments.

49.     On April 9, 2020 – after joining the daily Company Managing Directors' call -- Paley and Sica jointly worked on a large portfolio transaction for the Company.  Neither Sica nor anyone else in the Company suggested Mr. Paley had resigned and should not be involved in the transaction.

50.     Later that day, during a telephone call, Mr. Paley advised Sica that he had traveled back to New York City from Long Island the day prior in order to schedule an MRI and other doctors'/specialists' appointments in connection with his disability.

51.      On April 10, 2020, Mr. Paley had a remote, tele-medicine appointment with his primary care physician.  After said appointment, Mr. Paley communicated to Sica that he had spoken with his primary care physician earlier that morning, he was expecting to undergo a series of specialists' appointments; his present, litany of symptoms mirrored those that he had experienced many years prior which, as noted above, had eventuated in disability leave at Deutsche Bank; and he wanted to devise a "back-up coverage" plan, inasmuch as he was concerned that his illness manifestations would compel him to undergo disability leave at KLS and, to this end, he proposed two (2) Senior Managing Directors at KLS who could serve in

such a "back-up coverage" role.

52.     In furtherance of the above, Mr. Paley also communicated to the KLS Senior Managing Directors and Managing Directors of the plethora of symptoms that he was experiencing and the need to undergo an array of medical tests in the ensuing week.

53.     To this end, Mr. Paley sent client lists to all Senior Managing Directors who would be able to provide him with "back-up coverage" and he spoke with at least one (1) Senior Managing Director telephonically about the large volume of forthcoming transactions that Mr. Paley believed would be effectuated during the following week.

54.     On April 12, 2020, Mr. Paley communicated to Sica that he wanted to take off work the upcoming week in order to focus on treating his illness and could a discussion with Woodson about compensation be taken up again after Mr. Paley's requested week off for disability leave.

55.     On April 13, Woodson sent an email to Mr. Paley and copied to Colleen A. Graham, Executive Vice-President & General Counsel, Sica and Katherine Gavritsas ("Gavritsas"), the Company's Head of Human Resources, in which he once again falsely states that Mr. Paley resigned:

> "David,
>
> Thank you for providing us the opportunity to match the employment offer you received.  As per the conversation that you had with me and Gary Sica on April 6, we have decided that we will not continue those discussions and we will accept your resignation. This email is intended to reiterate in writing our acceptance of your resignation, effective Monday April 6, 2020. In accordance with the 2 week stipulated notice period, your employment will terminate as of April 17, 2020 and you will be paid through that date. You will receive your last paycheck via direct deposit on April 23, 2020. Your benefits will terminate on April 30, 2020.

Please be reminded of your obligations including with respect to employment exit policies as it pertains to client and employee communication, the return of company materials, and related matters, as well as the Non-Solicitation,
Non-Acceptance, Confidentiality and Arbitration Agreement.

Please direct any subsequent conversations with KLS/Boston Private to Colleen Graham at cgraham@bostonprivate.com or (212)505-4651.

We appreciate your valuable contribution to KLS/Boston Private and we wish you the best of luck in your future endeavors.

Sincerely,

Bill"
                    *        *        *

56.     That same day, Paley responded:

"I am shocked to receive your email. As I made it clear to you when we spoke, I have *never* tendered my resignation.  Indeed, I have made it very clear that I wanted to *stay* at KLS. My intention in informing the company back in January of an offer was to better understand the potential new compensation structure since the previous structure in place since I joined the company was eliminated. I discussed the other offer again in February since there was still no clarity regarding a new compensation structure and again stated that I wanted to remain at KLS. The feedback was that a new structure was being contemplated and details would be provided in the near future. I then contacted you again in April after I still had not heard any additional information and provided you with the specifics of the other offer. As I said on the call, I only provided the offer so that we could move forward in a more timely fashion of how you envisioned the new bonus structure would work.

In light of the fact that I have repeatedly informed you of my intention to remain at KLS, and that my performance reviews have always been excellent, I can only conclude that you are terminating my employment in retaliation for having recently informed the company that I am suffering from a medical disability and raised the question of how my clients would be properly cared for if my doctors were to recommend that I take a leave of absence."

57.     On April 14, 2020, Woodson falsely advised all KLS Senior Managing

Directors/Managing Directors that Mr. Paley had "resigned" from the Company.

58.     Then, that same day, Woodson sent an email to all KLS falsely stating that Paley

had resigned:

> "All,
>
> I hope this email finds everyone safe and in good spirits. We regret
> to announce that David Paley has decided to leave the organization
> to pursue other opportunities.
>
> While he will be missed, we wish him well in his future endeavors.
> David's last day with the firm will be Friday, April 17th.
>
> Please forward all business-related questions to Gary. Best,
>
> Bill"

59.     As a consequence of Mr. Woodson's false communications, Mr. Paley was

contacted by clients asking why Mr. Paley had so abruptly "resigned", several of whom were

upset that Mr. Paley would resign in the middle of a pandemic, for leaving them unattended in

the midst of a national crisis, and for not providing them with a courtesy call informing them of

his alleged "resignation."

60.     In truth, Mr. Paley was terminated because of his disability and request for a

reasonable accommodation.

61.     Defendants failed to engage in an interactive dialogue with plaintiff to

reasonably accommodate his disability.

62.     Plaintiff complained of Federal securities law violations and as a consequence he

was terminated.

63.     Defendants had no good faith legitimate business reason for terminating

Plaintiff.

## FIRST CAUSE OF ACTION

64.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "63" as if repeated and incorporated herein.

65.     Defendants' conduct set forth in this Complaint violated Title VIII of Sarbanes-Oxley Act of 2012 (18 U.S.C. 1514 A).

66.     Defendants terminated plaintiff because of his objections and complaints about defendant's improper front running.

67.     By reason of the foregoing, Defendants have caused plaintiff damages in an amount to be determined at trial..

## SECOND CAUSE OF ACTION

68.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "63" as if repeated and incorporated herein.

69.     By reason of the foregoing, Defendants discriminated against Plaintiff due to his disability and failed to reasonably accommodate Plaintiff's disability in violation of NYS Executive Law 296, et seq.

70.     As a consequence of the above, plaintiff has suffered damages in an amount ot be determined at trial.

## THIRD CAUSE OF ACTION

71.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "63" as if repeated and incorporated herein.

72.     By reason of the foregoing, Defendants discriminated against Plaintiff due to his disability and failed to reasonably accommodate Plaintiff's disability in violation of NYC Administrative Code 8-107, 8-502.

72.     As a consequence of the above, plaintiff has suffered damages in an amount to be determined at trial.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY**

**WHEREFORE**, plaintiff hereby demands judgment against defendant as follows:

(i)     On his first cause of action, assessing compensatory damages including (a) lost past and future earnings, bonuses, and equity awards; (b) reimbursing Mr. Paley for his litigation costs, expert witness fees and attorneys' fees; and (d) reinstatement of Mr. Paley to his employment position at KLS.

(ii)    On his second cause of action, assessing compensatory damages in an amount to be determined at trial;

(iii)   On his third cause of action, assessing compensatory and punitive damages in an amount determined at trial; and

(iii)   For such further relief as the Court deems just and proper.

Dated:   New York, New York
         January 5, 2021

KAISER SAURBORN & MAIR, P.C.
Attorneys for plaintiff

By: _____
Daniel J. Kaiser [DK-9387]
William H. Kaiser [WK-7106]
30 Broad Street, 37th Fl.
New York, New York 10004
(212) 338-9100